ROEHL TRANSPORT, INC., a Wisconsin corporation, Petitioner-Appellant,

v.

WISCONSIN DIVISION OF HEARINGS AND APPEALS, Respondent-Respondent.

Court of Appeals

*No. 97–0211. Submitted on briefs August 8, 1997.—Decided September 25, 1997.*

(Also reported in 570 N.W.2d 864.)

On behalf of the petitioner-appellant, the cause was submitted on the briefs of *Carl D. Fortner* of *Foley & Lardner* of Milwaukee, Wisconsin; *Carl L. Meissner* of *Zappen & Meissner* of Marshfield, Wisconsin; and *Richard C. Hutchison* of *Hutchison, Neider, Ward & King* of Salt Lake City, Utah.

On behalf of the respondent-respondent, the cause was submitted on the brief of *James E. Doyle*, attorney

general, with *Susan K. Ullman*, assistant attorney general.

Before Eich, C.J., Vergeront and Roggensack, JJ.

EICH, C.J. Roehl Transport, Inc., a large interstate trucking firm based in Wisconsin, challenged the imposition and collection of state taxes on fuel used by its truck fleet. Roehl claimed that fuel consumed while its trucks are idling in excess of eight minutes is not taxable and that the Wisconsin Department of Transportation lacks authority to collect taxes on behalf of two neighboring states. The parties agreed to have Roehl's challenge heard and determined by a hearing examiner in the Division of Hearings and Appeals,[1] rather than by the department, as is usually the case.[2] The examiner ruled that the taxes were properly imposed on fuel consumed while idling—except during off-highway use—and were properly collected by the department. Roehl petitioned the circuit court for review, and it affirmed the division's decision.

Roehl renews its arguments on appeal. But our *de novo* review of the division's interpretation and application of the relevant statutes, rules and interstate

---

[1] The Division of Hearings and Appeals is an arm of the Department of Administration. The division's administrator is authorized by statute to "[a]ssign . . . hearing examiner[s]" to preside over hearings and render decisions in matters before several state agencies and departments, including the Department of Transportation. Section 227.43(1)(b), STATS.

[2] In fact, Roehl had sought judicial review of the department's audit order and the circuit court remanded the matter to the department for further hearings. Roehl and the department then entered into a stipulation of facts and agreed that the hearing would proceed before the division.

compacts satisfies us that all issues have been correctly decided. We affirm the circuit court's order.

The facts were stipulated. Wisconsin imposes an excise or "use" tax on fuel consumed by interstate motor carriers, including fuel purchased in another state and "consumed by . . . qualified motor vehicle[s] while operated on the highways of this state." Section 341.45(1g)(a), STATS. Under § 341.45 and the administrative rules adopted thereunder, carriers must maintain records of all fuel purchases and report to the department the amount of "taxable" fuel (fuel consumed in highway operation) and "non-taxable" fuel (fuel consumed in off-highway operation) used by its fleet.[3]

Wisconsin is a party to an interstate compact known as the International Fuel Tax Agreement, or IFTA, which is designed to facilitate the collection of state fuel taxes from interstate motor carriers.[4] Under IFTA's terms, insofar as they are applicable here, the department is authorized to collect fuel taxes from Wisconsin-based carriers both on its own behalf and on behalf of other states who are parties to the compact.

Roehl, believing that significant amounts of fuel were being consumed by its trucks while they were stationary, installed measuring devices on each truck

---

[3] No tax is imposed on fuel consumed while the vehicle is being operated on private roads or driveways. WIS. ADM. CODE § TRANS 152.04(2)(b).

[4] Wisconsin joined the IFTA compact on July 1, 1989. *See* Appendix Note to WIS. ADM. CODE § TRANS 152.03, at 214. Prior to that time, the state was a party to the Wisconsin-Minnesota-Iowa Fuel Tax Agreement (WMIFTA), which set forth a similar mechanism for the collection of fuel taxes from interstate motor carriers. *See* Wisconsin-Minnesota-Iowa Fuel Tax Agreement (1986).

to monitor idling time. Knowing that idling time fell into two distinct categories—stops on the highway, such as waiting at railroad crossings, and off-highway idling, as when drivers would keep the engines running while sleeping in order to maintain a comfortable cab temperature—Roehl elected to treat all fuel consumed by its trucks while idling for periods of time exceeding eight minutes as non-taxable off-highway consumption, and in 1988 adjusted its tax payments accordingly.

The department conducted an audit of Roehl's fuel tax reports and filings for the years 1988–92, determined that Roehl had improperly withheld payment for fuel consumed while idling, and assessed additional taxes and penalties totaling $194,246.85. The assessment included taxes due to other IFTA member states as well.

At a hearing before the Division of Hearings and Appeals, Roehl argued that IFTA superseded Wisconsin law and exempted all fuel consumed while idling from the Wisconsin tax. It argued that because IFTA defined the "taxable event" as "the consumption of . . . fuels used in the propulsion of . . . vehicles," Wisconsin could tax only the fuel used in propelling vehicles forward. IFTA Articles of Agreement, art. III(a) (rev. Feb. 1993). The division's examiner disagreed, concluding that no conflict existed between IFTA and the taxing provisions of § 341.45, STATS. The examiner ruled that, under § 341.45(1g)(a) and WIS. ADM. CODE § TRANS 152.04(2)(b), the only applicable exemption was for operation—whether moving *or* idling—while not on a state highway. The examiner also rejected Roehl's argument that the department lacked authority under IFTA (or its predecessor, WMIFTA) to collect taxes on behalf of other states.

On review, the circuit court affirmed the division in all respects and denied Roehl's request for further hearings.

## I. Standard of Review

In administrative appeals, we review the agency's decision, not the circuit court's. *Sterlingworth Condominium Ass'n v. DNR*, 205 Wis. 2d 702, 712, 556 N.W.2d 791, 794 (Ct. App. 1996). Here, as in a growing number of appeals, the parties disagree as to the appropriate standard of judicial review of the division's decision. The division maintains that, at the very least, we owe due deference to its decision and need only look to see whether it is reasonable. Roehl argues that we must review the division's decision independently, paying it no deference whatsoever. We conclude that Roehl is correct.

As in all such inquiries, we begin with the proposition that the interpretation of statutes and their application to the facts present questions of law for courts to decide. However, in recognition of the expertise and experience in various fields possessed by state regulatory and administrative agencies, we will defer to an agency's interpretation and application of a statute in certain situations. We accord the highest degree of deference to an agency's decision when: (1) the agency is charged with administration of the statute at issue; (2) its interpretation is based on "its expertise or specialized knowledge"; (3) the interpretation provides "uniformity and consistency in the application of the statute"; and (4) it is one "of long standing." *Harnischfeger Corp. v. LIRC,* 196 Wis. 2d 650, 660, 539 N.W.2d

98, 102 (1995).[5] If those criteria are met, we will sustain the agency's interpretation if it is reasonable, even if another interpretation is equally reasonable—or even more reasonable than the agency's. *UFE Inc. v. LIRC*, 201 Wis. 2d 274, 287 n.3, 548 N.W.2d 57, 63 (1996). *See also MCI Telecomm. Corp. v. State*, 209 Wis. 2d 310, 562 N.W.2d 594 (1997).

■

We will also defer—although to a slightly lesser degree—to the legal interpretation of an agency that is charged with administration of the statute involved if it has developed some expertise in the particular area, but "has not developed the expertise which necessarily places it in a better position to make judgments regarding the interpretation of the statute than a court." *UFE Inc.*, 201 Wis. 2d at 286, 548 N.W.2d at 62. In such a case we will also sustain the agency's interpretation if it is reasonable, but only if no other interpretation is *more* reasonable than the agency's. *Id.* at 287, 548 N.W.2d at 62–63.[6]

---

[5] We also will pay great deference to an agency's interpretation when it is intertwined with value and policy determinations inherent in the role the legislature assigned the agency to play. *See Sterlingworth Condominium Ass'n v. DNR*, 205 Wis. 2d 702, 724, 556 N.W.2d 791, 798–99 (Ct. App. 1996).

[6] The supreme court said in *UFE* that, under either the great-weight or due-weight standard, "an equally reasonable interpretation of a statute should not be chosen over the agency's interpretation," and that "the important difference between great weight and due weight deference [is that] a more reasonable interpretation overcomes an agency's interpretation under due weight deference, while under great weight deference, a more reasonable interpretation will not overcome an agency's interpretation, as long as the agency's interpretation falls within a range of reasonableness." *UFE Inc. v. LIRC*, 201 Wis. 2d 274, 287 n.3, 548 N.W.2d 57, 63 (1996).

In this case, however, we are called upon to review not the decision of a "line" agency charged with the administration and enforcement of the statutes involved, and possessed of expertise or specialized knowledge in a particular regulatory field, but that of an individual hearing examiner assigned to hear the case by an official of the Department of Administration—a department created to provide management services and assistance to state agencies and departments. Section 16.001, STATS.

If we were reviewing a decision of the Department of Transportation, there would be little question that it would be entitled to considerable deference. But we are not. Nor is it the decision of an independent agency—such as the Tax Appeals Commission—created for the express purpose of reviewing decisions of a line agency. *See William Wrigley, Jr., Co. v. DOR*, 176 Wis. 2d 795, 801, 500 N.W.2d 667, 670 (1993) (we defer to decisions of the Tax Appeals Commission because it is "the final administrative authority" for review of Department of Revenue decisions and is experienced in interpreting and applying tax statutes); *DOR v. Heritage Mut. Ins. Co.*, 208 Wis. 2d 582, 589, 561 N.W.2d 344, 347 (Ct. App. 1997) (Tax Appeals Commission entitled to deference because it "has primary responsibility for [tax] policy determinations").

The division, relying on the department's expertise in conducting the original audit that determined Roehl's liability for the taxes, argues that since the audit "is at the root of this case," we should defer to the division's decision upholding the audit's conclusions. It is true, as the division points out, that the circuit court originally remanded the matter to the department for a hearing. But, as we have noted above, rather than pro-

ceed before the department, the parties instead decided to have one of the division's hearing examiners conduct the hearing.

The cases to which we have referred above demonstrate that judicial deference to administrative agency decisions is based on the agency's statutory responsibilities with respect to the statute or statutes in question, and its experience, expertise or specialized knowledge in the area under consideration. It is only when these criteria are met that the judicial system—the branch of government historically empowered to determine legal issues—will defer to an agency's legal conclusions.

The agency whose decision we are asked to review in this case—the Division of Hearings and Appeals—is a division of a management services agency. It has not been shown to possess any experience, expertise or specialized knowledge in the area of fuel or excise taxation, and it has no legislatively imposed duties to enforce or administer the state's tax laws. Under well-established law, its decision is entitled to no deference whatsoever and will be reviewed *ab initio*.

## II. Discussion

Roehl argued to the division, as it does to us, that the provisions of IFTA take precedence over state law and that, under IFTA, the "taxable event" for fuel excise taxation is not just the consumption of fuel but, in Roehl's words, the consumption of fuel "to *propel* the motor vehicle." (Emphasis added.) It bases that position on the following language in Article III(a) of the agreement:

461

> For purposes of this Agreement, the taxable event is the consumption of motor fuels used in the propulsion of qualified motor vehicles, except fuel consumed that is exempt from taxation by [the state].

Analogizing the situation to a gift tax, which it says does not come into play until occurrence of the taxable event—the giving of the gift—Roehl maintains that, under the quoted IFTA provision, the taxable event in this case is the consumption of fuel "for the purpose of propulsion." According to Roehl, fuel that is not consumed in actually propelling a truck forward, as when it is idling, is simply not taxable.

First, we do not believe IFTA should be read in isolation. As we have discussed, Wisconsin imposes a tax on fuel "*consumed* by . . . qualified motor vehicle[s] while *operated* on the highways of this state." Section 341.45(1g)(a), STATS. (emphasis added). The term "operated" is not defined in § 341.45. In common usage, to "operate" is "to run or control the functioning of," as in "operat[ing] a machine." AMERICAN HERITAGE DICTIONARY 871 (2d College ed., 1976). In other parts of the vehicle code, "operation" is something much broader than propelling a vehicle forward on the roadway. Section 346.63(3)(b), STATS., which deals with operation of motor vehicles while intoxicated, for example, defines the term to include the manipulation or activation of the vehicle's controls. Moreover, that definition is expressly incorporated in the administrative rules adopted by the department to govern administration of the fuel tax law and IFTA. WIS. ADM. CODE § TRANS 152.02(18). We do not share Roehl's belief that a vehicle ceases to be "operated" within the meaning of the

fuel tax statutes whenever its driver stops or interrupts its forward motion.

Second, we do not agree with Roehl that IFTA invariably trumps Wisconsin law. IFTA exists not to impose taxes but simply to "encourage the . . . most efficient possible use of the highway system by making uniform the administration of motor fuels use taxation laws with respect to . . . vehicles operated in multiple member jurisdictions." IFTA, art. I(b).[7] In *US Xpress, Inc. v. Utah State Tax Commission*, 886 P.2d 1115 (Utah Ct. App. 1994), the Utah Court of Appeals was considering the applicability of IFTA to that state's tax laws and regulations. The carrier, seeking to avoid imposition of the Utah fuel tax on fuel "used in non-propulsion motor vehicle operations," argued that the provisions of IFTA (presumably the same section argued here) supported tax-exempt status of such fuel and, further, that IFTA should prevail over conflicting state administrative rules. *Id.* at 1117. The court, agreeing that, under applicable state statutes IFTA prevailed over provisions of the administrative code,[8] nonetheless concluded that because taxation of fuel

---

[7] Consistent with these provisions, the department has interpreted IFTA as a procedural, rather than a substantive document:

> The IFTA is an agreement among states and provinces to simplify the reporting of fuel use taxes by interstate motor carriers. The IFTA reduces the paperwork and compliance burdens for fuel tax reporting. The IFTA does not impose taxes but allows interstate motor carriers to report their fuel use taxes to a base state on a uniform basis.

WIS. ADM. CODE § TRANS 152.03.

[8] The Utah statute authorizing the state's participation in IFTA, UTAH CODE ANN. § 59–13–501(7) (Michie 1997), provides that if any IFTA provisions conflict with rules of the tax commission, "the [IFTA] provisions prevail." Wisconsin has no such

used for "non-propulsion" purposes was based on state statutes, the statutes controlled. *Id.* at 1119.

Roehl disagrees. Offering only a nonspecific citation to a Washington case, *Klickitat County v. Washington*, 862 P.2d 629 (Wash. Ct. App. 1993), it maintains that "the terms of IFTA take precedence over any conflicting state law." But Roehl fails to point us to any specific portion of that decision validating its argument that IFTA negates various portions of the Wisconsin Statutes imposing an excise tax on motor vehicle fuel. Indeed, *Klickitat County* was not about IFTA at all. Instead, it involved a county's responsibility for adopting land-use ordinances in compliance with a plan developed by an interstate compact commission created to manage a scenic area along the Columbia River.

We are aware of other cases holding generally that parties to an interstate compact, though they cannot unilaterally change the terms of the document, remain free to " 'legislate in respect of matters covered by the compact' " so long as that action does not conflict with the compact's terms. *See, e.g., Kansas City Area Transp. Auth. v. Missouri*, 640 F.2d 173, 174 (8th Cir. 1981) (quoted source omitted). We also are aware that one federal court has added to that proposition a wholly unsupported and unexplained comment that "[a] Compact also takes precedence over statutory law in member states." *McComb v. Wambaugh*, 934 F.2d 474, 479 (3d Cir. 1991). We assume the reference is to the rule that a member state may not pass laws that conflict with compact provisions. *See, e.g., Alcorn v. Wolfe*, 827 F. Supp. 47, 52–53 (D.D.C. 1993) (the terms of the compact under consideration "cannot be modified uni-

---

statute, although WIS. ADM. CODE § TRANS 152.03 contains a similar declaration.

laterally by state legislation and take precedence over *conflicting* state law") (emphasis added). We see no such conflict between Article III(a) of IFTA and § 341.45(1g)(a), STATS.

Contrary to Roehl's assertions, we do not believe that IFTA's description of the taxable event as "the consumption of . . . fuels used in the propulsion of . . . vehicles" limits the tax to fuel used in propelling the vehicle forward. The key word in the clause is *consumption*, not *propulsion*. IFTA, like § 341.45(1g)(a), STATS., contemplates a tax on the consumption of fuel and, as we noted above, a vehicle neither ceases to be operated nor ceases consuming fuel while it is idling on highways of the state. We see IFTA's "used in . . . propulsion" language as relating to the fuel itself, not to the specific purpose for which the fuel might be used at any given moment. The language distinguishes fuel that is actually consumed in the operation (or propulsion) of vehicles from fuel purchased for other purposes, such as placement in a supply tank, or for use by vehicles other than "qualified motor vehicles" within the meaning of the law. This is consistent not only with § 341.45 but also with the manifest purpose of the tax, which is to charge interstate motor carriers for operating commercial vehicles on highways built, paid for and maintained by the people of Wisconsin. *See Roehl Transp., Inc. v. Indiana Dep't of Revenue*, 653 N.E.2d 539, 542–43 (Ind. Tax Ct. 1995).

Finally, we note that IFTA itself states, "All motor fuel acquired which is normally subject to consumption tax is taxable unless proof to the contrary is provided by the licensee,"[9] and the "[t]otal number of gallons . . .

---

[9] WISCONSIN ADM. CODE § TRANS 152.07(4) contains substantially similar language.

of motor fuel used by the licensee in operation of qualified motor vehicles" must be reported to the base state. IFTA, arts. III(c) and IX(c)(2). The division did not dispute Roehl's measurements of idle time. It concluded, however, that Roehl had failed to meet its burden of proving that the amounts of purchased fuel it deducted from its tax reports were in fact not taxable. In so concluding, the division noted that all Roehl had offered on the point was its idling measurements and its own "assumption . . . that any time one of its vehicles is idling for a period longer than eight consecutive minutes, the idling is occurring off-highway." Roehl presented no records or other information that would indicate in fact how much fuel was actually consumed in off-highway use.

Roehl, repeating the same arguments it made to the division, has not persuaded us that a different result should obtain on appeal.[10]

Roehl next argues that the department lacked authority to collect taxes for Wisconsin, Minnesota and Iowa prior to July 1, 1989, when Wisconsin first became a party to IFTA. As we noted above, in the years prior to its adoption of IFTA, Wisconsin, Minnesota and Iowa were parties to an interstate fuel tax agreement—WMIFTA. Both the division and the cir-

---

[10] Roehl suggests that it never had the opportunity to present evidence in support of its assumptions because it was contemplated that further hearings would be held before a final determination of taxes would be made. However, Roehl does not discuss any "evidence" other than its calculation of idling time and its unsupported assumption that all idling time more than eight minutes in length was in off-highway use. As we discuss below, Roehl has not shown that it is entitled to further hearings.

cuit court ruled that WMIFTA gave the department the requisite authority to collect and assess taxes.

Roehl disagrees, arguing that: (1) WMIFTA did not give Wisconsin (or any other state) authority to assess or collect fuel taxes for other states; and (2) any assessment for taxes due Minnesota and Iowa during this period is invalid under each state's statute of limitations. As to the first argument, the division notes that the stipulated facts presented to the hearing examiner characterized both WMIFTA and IFTA as authorizing the assessment and collection of fuel taxes.[11] In addition, WMIFTA provided that all Wisconsin carriers volunteering to participate in the agreement (including Roehl) were to file fuel reports showing the "mileage driven and fuel consumed . . . in Wisconsin, Minnesota and Iowa," WMIFTA, ¶ 2 (1986), and that Wisconsin would then "collect net taxes owed . . . for all three jurisdictions." *Id.* at ¶ 3. The agreement also gave the department the authority to "audit[ ] . . . the carrier's fuel purchases and mileage records." *Id.* at ¶ 5. We think WMIFTA provides ample authority for the department to collect the 1988 taxes.

Roehl's argument largely ignores WMIFTA. It focuses not on the language of the agreement but on a clause appearing at the foot of a blank mimeographed application form, apparently prepared by the depart-

---

[11] The stipulation provided as follows:

Relating to the assessment, collection, audit and enforcement of fuel taxes imposed on interstate motor vehicles . . . .

. . . Roehl was [during 1988 and the first half of 1989] a participant in the [WMIFTA]. Commencing in July 1989, Roehl elected to satisfy its fuel use tax obligations by applying for an IFTA license from [the department] and to file quarterly reports along with the payment of taxes due to the [department] and all other IFTA member jurisdictions.

ment for carriers desiring to participate in WMIFTA, which states that the carrier agrees to comply with all of the reporting, payment and record-keeping requirements of the agreement and understands that "failure to comply with these provisions will be grounds for revocation of my credential[s] in all member jurisdictions." Citing this clause, Roehl argues that the only recourse available to the state for underpayment or non-payment of fuel taxes under WMIFTA was revocation of credentials in the participating states. Thus, Roehl believes that the department lacked any authority to collect the delinquent taxes. As indicated, the plain language of WMIFTA is to the contrary; it authorizes the department to collect taxes owed to the other states and to audit Roehl for its compliance with the "collection, audit and enforcement" provisions of the agreement. Roehl's position that the acknowledgment on a blank, unsigned form should be held to override the express language of the agreement is unpersuasive.

Roehl next refers us to Minnesota and Iowa statutes requiring motor carriers to keep and preserve tax-reporting records "for a period of three years." *See* MINN. STAT. ANN. § 296.17(14) (West 1991); IOWA CODE ANN. § 324.55 (West 1989). Describing these laws as "statute[s] of limitation," Roehl argues that they bar any attempt by the department to audit records compiled more than three years prior to July 1, 1992, the date the audit was initiated. Here, too, such an unamplified assertion provides no basis for concluding that the Iowa and Minnesota record-keeping statutes should be read as statutes of limitation barring the collection of unpaid fuel taxes.

Roehl closes by asserting that if we are to uphold the division's legal conclusions (as we have done), we

should nonetheless remand for further hearings "pertaining to Roehl's methods of determining and recording [its] off-highway fuel consumption." Roehl maintains that it had two disputes over the department's audit: (1) the rejection of its "legal position" (that fuel consumed while idling is never taxable); and (2) the rejection of its "record-keeping methods" for calculating exempt off-highway fuel consumption.

Roehl claims that the terms of the parties' prehearing stipulation entitle it to further hearings—referring in particular to a statement in the stipulation that "[t]he proper measure of fuel tax, if necessary, will be determined later." It argues that it has never had the opportunity to present evidence as to the amount of fuel consumed off-highway, and it says it "can provide abundant proof to support its claim that fuel was used for a tax-exempt purpose."[12] But, as we indicated, *supra* note 10, the only evidence Roehl provides refers again to its assertion that, *ipso facto*, any idling time longer than eight minutes in duration must necessarily be incurred in off-highway operation. Without supporting evidence, we are unwilling to take the

---

[12] With respect to the stipulation, we note that, prior to the hearing, the division's hearing examiner wrote to the parties offering his interpretation of its pertinent terms. He wrote:

> If the finding is that [Roehl] is required to report fuel consumed for non-propulsion purposes, this determination will be dispositive of the issues in this case. . . .
>
> If my determination is that [Roehl] is not required to report non-propulsion fuel, another outstanding issue will need to be addressed. That issue is whether the Department properly calculated the assessment for non-propulsion fuel in its audit of . . . [Roehl]. In that event, my decision will be in the form of a ruling and further proceedings to address this issue will be scheduled.

The "dispositive" determination was plainly made by the division.

leap of faith required to validate such an assertion. Roehl has not satisfied us that further hearings are warranted in this case.

*By the Court.*—Order affirmed.